## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ANNIE MAY WEIDNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-1250-MN |
| | ) | |
| KILOLO KIJAKAZI,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

### I.   INTRODUCTION

Plaintiff Annie May Weidner ("Weidner") filed this action pursuant to 42 U.S.C. § 405(g) on September 17, 2020 against the defendant Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration (the "Commissioner").  (D.I. 1)  Weidner seeks judicial review of the Commissioner's September 5, 2019 final decision denying Weidner's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434.  Currently before the court are cross-motions for summary judgment filed by Weidner and the Commissioner.[2]  (D.I. 15; D.I. 18)  For the reasons set forth below, I recommend that the court DENY Weidner's motion for summary judgment (D.I. 15), and GRANT the Commissioner's cross-motion for summary judgment (D.I. 18).

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Therefore, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Ms. Kijakazi is substituted as Defendant in place of Andrew Saul.

[2] The briefing for the present motions is as follows:  Weidner's opening brief (D.I. 16), the Commissioner's combined opening brief in support of the motion for summary judgment and answering brief in opposition to Weidner's motion (D.I. 19), and Weidner's answering brief in opposition to the Commissioner's motion and reply brief (D.I. 20).

## II.   BACKGROUND

### A. Procedural History

Weidner filed a DIB application on May 21, 2018, alleging a disability onset date of May 24, 2013 due to fibromyalgia, osteoarthritis, three herniated discs, right ankle deterioration, depression, migraine headaches, loss of strength in both hands, and locking of her left hip.  (D.I. 10-5 at 2-3; D.I. 10-6 at 6)[3]  Weidner's claims were denied initially in August 2018.  (D.I. 10-3 at 9)  At Weidner's request, an administrative law judge ("ALJ") held a hearing on August 20, 2019.  (D.I. 10-2 at 35-76)  The ALJ issued an unfavorable decision on September 5, 2019, finding that Weidner was not disabled under the Act because she could perform a reduced range of sedentary work.  (*Id.* at 11-21)  The Appeals Council subsequently denied Weidner's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner.  (*Id.* at 2-4)

Weidner brought this civil action challenging the ALJ's decision on September 17, 2020.  (D.I. 1)  Weidner filed her pending motion for summary judgment on May 10, 2021 (D.I. 15), and the Commissioner cross-moved for summary judgment on July 1, 2021 (D.I. 18).  Briefing is now complete.

### B. Medical History

Weidner was 57 years old on December 31, 2015, her date last insured.  (D.I. 10-2 at 41)  Weidner has a ninth-grade education and has past relevant work as an accounts payable clerk and a receptionist.  (*Id.*)  The ALJ found that Weidner had the following severe impairments: tarsal tunnel syndrome of the left foot, status post-surgery and plantar fasciitis of the left foot status

---

[3] Weidner bears the burden of proving she was disabled as defined in the Act from the date of the alleged disability onset, May 24, 2013, through the date she was last insured, December 21, 2015.

post-surgery; osteoarthritis of the right ankle; right peroneal motor neuropathy; degenerative disc

disease of the cervical spine; and degenerative disc disease of the lumbar spine. (*Id.* at 13)

Weidner challenges the ALJ's legal conclusions, as opposed to the evidentiary basis for the

ALJ's decision, with a particular focus on Weidner's mental impairments and her cervical

degenerative disc disease. (D.I. 16) Because Weidner does not challenge the ALJ's factual or

legal conclusions regarding the balance of her impairments, the court does not address those

conditions in detail here.

### 1. Medical evidence

In March 2013, Weidner saw Martin A. Jacobson, M.D. for treatment of several

conditions, including generalized anxiety. (D.I. 10-9 at 101) Dr. Jacobson indicated that

Weidner was not interested in medication to treat her anxiety at the time. (*Id.*) She reported

increased anxiety in October 2013 after her in laws moved into her home and began taking

Xanax to treat her anxiety. (*Id.* at 104-05) Dr. Jacobson described Weidner as having normal

mood and affect, normal behavior, and normal judgment and thought content. (*Id.* at 103, 105-

06)

In March 2014, Weidner returned to Dr. Jacobson for treatment of her neck pain and

anxiety, among other conditions. (D.I. 10-8 at 83) On physical examination, Weidner exhibited

a full range of motion in her neck, but she experienced pain with extension and tipping to the

left, which radiated to her left shoulder. (*Id.* at 84) With respect to Weidner's anxiety, Dr.

Jacobson continued to describe Weidner as having normal mood and affect, normal behavior,

and normal judgment and thought content. (*Id.* at 85) Dr. Jacobson increased Weidner's

gabapentin and tramadol dosage to address her neck pain, and he encouraged her to use Xanax

more often for her anxiety. (*Id.*)

Weidner did not address her anxiety with Dr. Jacobson again until March 2015, when she

explained that her living situation with her in laws had exacerbated her anxiety. (D.I. 10-8 at 88)

Dr. Jacobson noted that Weidner was nervous and anxious, but she exhibited a normal mood and

affect, normal behavior, and normal judgment and thought content. (*Id.* at 89-90) Dr. Jacobson

indicated that Weidner's anxiety was stable with medication. (*Id.* at 90, 92)

Weidner did not complain of neck pain again until her visit with Dr. Jessica Lynn

Schwartz, D.O. in September 2015, when she indicated that the pain had grown worse over the

last three to four months. (D.I. 10-8 at 91) Although Weidner experienced pain in her neck and

radiculopathy down her left arm when she turned her neck to the left, she represented that it did

not limit her ability to perform daily tasks. (*Id.*) A physical examination revealed a decreased

range of motion in her cervical back and left rotation stopped at 40 degrees due to pain, with no

tenderness or spasm. (*Id.* at 92) Dr. Schwartz advised Weidner to obtain x-rays of her cervical

spine and attend physical therapy. (*Id.* at 93)

An x-ray of Weidner's cervical spine taken the following month revealed mild-to-

moderate diffuse degenerative joint disease and mild foraminal narrowing. (D.I. 10-7 at 409)

The cervical vertebrae were normal in height and alignment, and no soft tissue swelling was

noted. (*Id.*) The findings were described as revealing "age appropriate changes," and Weidner

was diagnosed with cervical spondylosis with radiculopathy. (*Id.* at 17) Physical therapy was

recommended. (*Id.*)

In November 2015, Weidner had an initial consultation at The Reading Neck & Spine

Center to assess her neck pain. (D.I. 10-7 at 15) At the time, Weidner indicated that her neck

pain had been constant for the past six to eight months, with pain radiating between her shoulder

and throughout her left shoulder. (*Id.*) Weidner noted improvement with the use of a neck

4

pillow and worsening with turning her neck to the left. (*Id.*) Gabapentin, tramadol, and Tylenol gave Weidner minimal relief from her pain. (*Id.*) Weidner's treatment notes identified her history of depression and anxiety and described her occupation as "[i]n-home caregiver," which was "physically demanding without heavy lifting." (*Id.*) On physical examination, Weidner exhibited decreased range of motion in her cervical spine with left axial rotation, but full bilateral range of motion in her shoulders with no tenderness in her cervical spine or shoulders. (*Id.* at 16)

Weidner visited rheumatologist Nancy J. Walker, M.D. in June 2016 for treatment of her ankle and foot pain, neck pain, low back pain, osteoporosis, and fibromyositis. (D.I. 10-7 at 396, 399) Dr. Walker identified Weidner's chronic low back pain, depressive symptoms, and difficulty standing or walking for long periods without pain. (*Id.* at 396) Weidner described improvement in her muscle pain with gabapentin, and she reported that tramadol helped her low back pain and sleep issues. (*Id.*)

An MRI of Weidner's cervical spine from June 2016 revealed cervical facet spondylosis. (D.I. 10-8 at 340) In treatment notes from November 2016, Dr. Robert Salvage, M.D. indicated that Weidner's cervical spine range of motion was restricted and she had paraspinal and occipital tenderness. (*Id.*) Dr. Salvage recommended that Weidner receive an epidural steroid injection. (*Id.* at 341)

### 2. Medical opinions

On July 30, 2018, state agency psychological consultant Michelle R. Santilli, Psy.D. reviewed Weidner's medical records and observed that Weidner had not undergone a detailed mental status exam before December 31, 2015. (D.I. 10-3 at 7-8) Consequently, Dr. Santilli found insufficient evidence of Weidner's ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; or adapt or manage herself. (*Id.* at 7)

On August 1, 2018, state agency medical consultant James Butcofski, M.D. reviewed Weidner's records and found that there was insufficient evidence of record to support Weidner's claim for disability prior to her date last insured. (D.I. 10-3 at 6)

In a physical residual functional capacity questionnaire dated September 13, 2018, Dr. Schwartz opined that Weidner's symptoms and functional limitations were impacted by her depression, and those symptoms were enough to frequently interfere with her attention and concentration. (D.I. 10-8 at 64) Dr. Schwartz indicated that Weidner could sit for 30 minutes and stand for 20 minutes at a time before needing to change positions, and she could sit and stand for less than two hours total in an eight-hour workday. (*Id.* at 65) As a result, Dr. Schwartz opined that Weidner would need a job where she could change positions at will, take unscheduled breaks, elevate her legs, and utilize an assistive device for walking and standing. (*Id.* at 65-66) Dr. Schwartz also represented that Weidner could not move her head in any direction. (*Id.* at 66) She estimated that Weidner would be absent from work four or more days per month. (*Id.* at 67)

In a physical residual functional capacity questionnaire dated September 27, 2018, Dr. Walker explained that she treated Weidner for fibromyalgia and spine conditions, and she noted Weidner's history of depression and anxiety. (D.I. 10-8 at 69-70) Dr. Walker opined that Weidner's symptoms would frequently interfere with her attention and concentration, she could sit and stand no more than 20 minutes at a time before needing to change position, and she could sit and stand less than two hours in an eight-hour workday. (*Id.* at 70-71) Therefore, Dr. Walker opined that Weidner would need a job where she could change positions at will, take frequent unscheduled breaks, elevate her legs, and utilize an assistive device for walking and standing. (*Id.* at 71-72) Dr. Walker also represented that Weidner could not move her head in any

direction, and she estimated that Weidner would be absent from work four or more days per
month.  (*Id.* at 72-73)

### 3.  Nonmedical evidence

On June 30, 2018, Weidner completed a function report outlining the symptoms of her
conditions and their effect on her activities of daily living.  (D.I. 10-6 at 76-85)  Weidner
reported that she had difficulty moving due to constant pain, and her depression made her tired
and unhappy.  (*Id.* at 76)  Nonetheless, she indicated that she was able to fix meals, dust,
vacuum, do laundry, walk her dog, and clean the kitchen and bathrooms, and she reported no
difficulty maintaining her personal care.  (*Id.* at 77)  She represented that she cared for her
mother-in-law who lived with her, assisting her with meals, laundry, personal hygiene, and daily
medications.  (*Id.*)  She stated that she could drive a car, go out alone, go grocery shopping, and
manage her money.  (*Id.* at 79)

Due her symptoms, Weidner stated that she can no longer bend, lift, stand, go to social
gatherings, or sleep well.  (D.I. 10-6 at 77)  Although Weidner used to do yard work on a daily
basis and go antique or thrift store shopping on a weekly basis, she indicated that she could no
longer do yard work and only went thrift shopping once a month.  (*Id.* at 80)  Due to her
depression, her social activities were limited to phone calls with family members and taking her
dog on weekly play dates.  (*Id.*)  She represented that she had difficulty getting along with others
and had no desire to socialize, although she normally got along with authority figures.  (*Id.* at 81-
82)  She struggled to handle stress or changes to her routine.  (*Id.* at 82)  She also used a cane on
a daily basis.  (*Id.*)

### C. Hearing Before the ALJ

#### 1. Weidner's Testimony

During the August 20, 2019 hearing before the ALJ, Weidner testified that she lives with her husband and her mother-in-law, she has a ninth-grade education, and she does not have a GED. (D.I. 10-2 at 40-41) She previously worked in accounts payable doing data entry and filing, and she worked as a front desk receptionist at an assisted living facility, which involved greeting visitors, answering the phone, printing documents, and performing security checks. (*Id.* at 42-44) She also worked as a cashier, floor salesperson, and shelf stocker at a craft store. (*Id.* at 46-47) She testified that she stopped working in 2011 due to pain in her back. (*Id.*) The ALJ directed Weidner to three notations in her medical records suggesting that she stopped working at her retail position to care for her in-laws, but Weidner denied this was the case and said her mother-in-law is able to take care of herself. (*Id.* at 59-61)

Weidner testified that she used a cane before her foot and ankle surgery in 2015, and she has worn a brace on her right hand and wrist for years because she cannot use her right thumb. (D.I. 10-2 at 51-52) When describing her activities of daily living, Weidner said that she rests most of the time now. (*Id.* at 55) During the relevant time period, she explained that her condition got progressively worse and she avoided lifting, bending, or climbing stairs. (*Id.* at 56) She represented that her husband took care of most of the cleaning, grocery shopping, and laundry. (*Id.*) A herniated disc in her neck prevents her from moving her head in all directions and continues to impact her ability to watch television and read. (*Id.* at 56-58) She reported problems with walking more than a block and sitting more than twenty or thirty minutes during the relevant time period. (*Id.* at 64-65) Weidner testified that she attends to her own hygiene independently. (*Id.* at 65)

Weidner also stated that she sees her primary care physician and an arthritis specialist twice a year. (D.I. 10-2 at 53-54) Her doctors prescribe medication, but the medication provides minimal relief. (*Id.* at 54)

## 2. Vocational Expert Testimony Before the ALJ

At the administrative hearing in August 2019, the ALJ posed the following hypothetical to vocational expert Michelle Peters-Pagella ("the VE"):

> I would like you to consider an individual ranging in age from 54 to 57 at DLI who has a ninth grade education per testimony and work experience as you've described. I would like you to assume for the first hypothetical question that this individual was capable of performing a range of light work as follows: lift and/or carry 20 pounds occasionally, 10 pounds frequently; stand and/or walk for about six hours in an eight-hour workday with normal breaks; sit for about six hours in an eight-hour workday with normal breaks; no more than occasionally climb, stoop, crouch, crawl kneel, and balance. If an individual were so limited and no other significant limitations could the person perform any of the past work in your opinion?

(D.I. 10-2 at 71) In response to the ALJ's hypothetical, the VE testified that such a hypothetical individual would be able to perform Weidner's past work as an accounts payable clerk and a receptionist. (*Id.*) The ALJ asked the VE if these positions would still be available to a hypothetical individual who could walk and stand no more than two hours in an eight-hour workday, lift and carry ten pounds occasionally, and lift and carry less than ten pounds frequently. (*Id.* at 71-72) The VE confirmed that the hypothetical individual could perform work as an accounts payable clerk and receptionist as defined by the Dictionary of Occupational Titles ("DOT") under those circumstances. (*Id.*) The ALJ next asked the VE if an employer would tolerate an employee requiring extra breaks for about fifteen percent of the workday due to pain and discomfort. (D.I. 10-2 at 72) The VE responded that, if the hypothetical individual were off task fifteen percent or more of the day outside of normal breaks, the individual would not be able to sustain competitive employment. (*Id.*)

9

The ALJ then also inquired about another hypothetical individual:

> I'd like you to assume that this individual could rarely lift less than ten pounds, sit less than two hours total; stand/walk less than two hours total; sit no more than 30 minutes at a time and stand for no more than 20 minutes at a time; needs to elevate the legs; require use of a cane for ambulation; never look down, turn the head to look up, or hold the head in a static position; rarely twist, stoop, crouch, squat, and climb ladders; occasionally climb stairs; never grasp, turn, twist objects with the right upper extremity, only occasionally left upper extremity; also would miss more than four days of work per month. Obviously, there would be no work; is that correct?

(D.I. 10-2 at 72-73)  The VE confirmed that such an individual would not be able to work.  (*Id.* at 73)  The VE further indicated that whether Weidner's past jobs would allow for a sit/stand option would depend on the ability to remain on task and the frequency of the sit/stand position changes.  (*Id.*)  The VE explained that, while standing for a few minutes every hour would be acceptable, changing positions every fifteen minutes would not because the jobs require sitting on a more frequent basis.  (*Id.* at 73-74)

In response to questioning by Weidner's counsel, the VE testified that a hypothetical individual's inability to frequently perform bilateral gross and fine manipulation and reaching would preclude work as an accounts payable clerk or a receptionist.  (D.I. 10-2 at 74-75)  The VE further confirmed that limits on the hypothetical individual's ability to hold her head steady for a significant period of time and rarely look to the sides, up, or down would preclude work as an accounts payable clerk or receptionist.  (*Id.* at 75)

### D. The ALJ's Findings

Based on the factual evidence in the record and the testimony by Weidner and the VE, the ALJ determined that Weidner was not disabled under the Act for the relevant time period from the May 24, 2013 disability onset date through the December 31, 2015 date last insured. (D.I. 10-2 at 20)  The ALJ found, in pertinent part:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2015.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of May 24, 2013 through her date last insured of December 31, 2015 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: tarsal tunnel syndrome of the left foot, status post-surgery and plantar fasciitis of the left foot status post-surgery; osteoarthritis of the right ankle; right peroneal motor neuropathy; degenerative disc disease of the cervical spine; and degenerative disc disease of the lumbar spine (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except with the following additional limitations. The claimant was able to lift and/or carry 20 pounds occasionally and 10 pounds frequently. She could stand and/or walk for two hours of an eight-hour workday with normal breaks and sit for six hours of an eight-hour workday with normal breaks. She could no more than occasionally climb, stoop, crouch, crawl, kneel, and balance.

6. Through the date last insured, the claimant was capable of performing past relevant work as an accounts payable clerk and receptionist. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from May 24, 2013, the alleged onset date, through December 31, 2015, the date last insured (20 CFR 404.1520(f)).

(D.I. 10-2 at 13-20)

## III.   STANDARD OF REVIEW

Judicial review of the ALJ's decision is limited to determining whether substantial evidence supports the decision.[4] *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "Substantial evidence means enough relevant evidence that 'a reasonable mind might accept as adequate to support a conclusion.'" *Pearson v. Comm'r of Soc. Sec.*, 839 F. App'x 684, 687 (3d Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154).  When applying the substantial evidence standard, the court "looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek*, 139 S. Ct. at 1154 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The threshold for satisfying the substantial evidence standard is "not high[,]" requiring "more than a mere scintilla" of evidence. *Id.*

## IV.   DISCUSSION

### A.  Disability Determination Process

Title II of the Act affords insurance benefits to people who contributed to the program and who have a disability. *See Pearson*, 839 F. App'x at 687 (citing 42 U.S.C. § 423(a)(1)).  A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  A claimant is only disabled if the impairments are so severe that they

---

[4] In her reply brief, Weidner concedes that the ALJ's decision was supported by substantial evidence. (*See, e.g.*, D.I. 20 at 1-2)  Instead, Weidner argues that the ALJ made a series of legal errors in his decision. (*Id.*)  The Third Circuit has recognized that the court may assess whether the Commissioner applied the correct legal standards. *See Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983).  Courts exercise plenary review of legal issues and review the ALJ's findings of fact to determine whether they are supported by substantial evidence. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999) (internal citations omitted).

preclude a return to previous work or engagement in any other kind of substantial gainful work existing in the national economy. *Id.* at § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003). To qualify for disability insurance benefits, a claimant must establish disability prior to the date last insured. 20 C.F.R. § 404.131 (2016); *Zirnsak v. Colvin*, 777 F.3d 607, 611-12 (3d Cir. 2014).

The Commissioner must perform a five-step analysis to determine whether a person is disabled. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If the Commissioner makes a finding of disability or non-disability at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. § 404.1520(a)(4). At step one, the Commissioner determines whether the claimant is engaged in any substantial gainful activity. *See id.* at § 404.1520(a)(4)(i). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. *See id.* at § 404.1520(a)(4)(ii).

If the claimant's impairments are severe, at step three, the Commissioner compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See id.* at § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches a listed impairment, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See id.* at § 404.1520(e).

At step four, the ALJ considers whether the claimant retains the residual functional capacity ("RFC") to perform past relevant work. *See id.* at § 404.1520(a)(4)(iv); *Plummer*, 186

13

F.3d at 428.  A claimant's RFC "measures the most she can do despite her limitations."  *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (quoting 20 C.F.R. § 404.1545(a)(1)) (internal quotations and alterations omitted).  The claimant bears the burden of demonstrating the inability to return to past relevant work.  *See Plummer*, 186 F.3d at 428

If the claimant is unable to return to past relevant work, at step five, the Commissioner must demonstrate that the claimant's impairments do not preclude an adjustment to any other available work.  *See* 20 C.F.R. § 404.1520(g); *Plummer*, 186 F.3d at 428.  In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]."  *Plummer*, 186 F.3d at 428.  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether he or she is capable of performing work and is not disabled.  *See id.*  The ALJ often seeks the VE's assistance in making this finding.  *See id.*

### B.  Whether the ALJ's Decision is Based on Legal Error

Weidner does not challenge whether the ALJ's decision is supported by substantial evidence.  (D.I. 20 at 1-2) ("Ms. Weidner has not argued that the ALJ's decision is not supported by substantial evidence. . . . Ms. Weidner has in no way asked this Court to re-weigh the evidence of record.").  Instead, Weidner contends that the ALJ committed legal error in several aspects of the written decision: (1) the ALJ failed to account for the composite nature of Weidner's past work as a receptionist and an accounts payable clerk; (2) the ALJ failed to adopt credible mental limitations and develop the administrative record regarding Weidner's mental impairments; (3) the ALJ erred in the evaluation of the medical opinion evidence; and (4) the ALJ failed to include functional restrictions in the RFC analysis to account for Weidner's

cervical degenerative disc disease.  (D.I. 20)

### 1. Weidner's past work

Weidner argues that the ALJ erred at step four of the sequential evaluation process when he found that she could perform her past relevant work as an accounts payable clerk and a receptionist because these positions, as performed by Weidner, were composite jobs requiring the performance of elements of two or more jobs.  (D.I. 16 at 4)  According to Weidner, the receptionist position also entailed security duties and the emergency provision of personal care to assisted living residents, and the accounts payable position involved lifting and carrying heavy boxes upstairs for filing.  (*Id.* at 4-6)  In response, the Commissioner contends that Weidner's past positions were not composite jobs because the additional tasks performed by Weidner either fell outside the scope of the job requirements or they did not amount to significant elements of another position.  (D.I. 19 at 22-23)

At step four, the claimant bears the ultimate burden of demonstrating an inability to return to her past relevant work.  *Plummer*, 186 F.3d at 428; *Ramirez v. Barnhart*, 372 F.3d 546, 550-51 (3d Cir. 2004).  "When significant variations exist between a claimant's description of past work and the [DOT's] description of work, an ALJ may consider whether the job is a 'composite job,'" which is defined as a job containing "substantial elements of two or more occupations" that lacks any counterpart in the DOT.  *Reed v. Berryhill*, 337 F. Supp. 3d 525, 529 (E.D. Pa. 2018) (citing SSR 82-61, 1982 WL 31387, at *2 (S.S.A. Jan. 1, 1982)).  "In other words, a composite position must involve additional 'main duties' from another DOT position, rather than 'merely excessive function[s] with the job duties from one DOT position.'"  *Id.* (quoting *Giddings v. Berryhill*, 2018 WL 4252426, at *4 (E.D. Pa. Sept. 5, 2018)).

15

The additional duties identified by Weidner in her testimony regarding her work as a receptionist and an accounts payable clerk cannot fairly be characterized as "main duties" of another DOT position. In describing her role as a receptionist at an assisted living facility, Weidner testified that she performed security checks twice a week at the end of her shift to ensure that the interior doors were locked on all three floors of the facility. (D.I. 10-2 at 43-44, 48, 67-71) She estimated that the task took her approximately fifteen minutes to complete. (*Id.* at 68) The VE expressly considered this task and concluded that the receptionist position should not be characterized as a combination job with a security guard because "it was more or less it appears checking doors to make sure they were locked." (*Id.* at 70-71) On this record, the ALJ did not err in rejecting Weidner's suggestion that her prior work as a receptionist involved the additional "main duties" of a security guard.

Moreover, the ALJ did not err in rejecting Weidner's assertion that the occasional physical assistance she provided to residents transformed her past work as a receptionist into a composite job. Weidner's own testimony confirms that she was not supposed to lift or physically assist residents as part of her job duties. (D.I. 10-2 at 44, 49, 70) The VE explained that the receptionist position may not be described as sedentary if Weidner was required to assist residents, but Weidner responded that "it [w]as not – that was not a part of my job." (D.I. 10-2 at 70) Weidner's past work as a receptionist cannot be construed as a composite job based on her performance of a task falling outside the scope of her job responsibilities. Therefore, the ALJ did not err in finding that Weidner could perform her past relevant work as a receptionist as the job was generally performed. (D.I. 10-2 at 20)

Moreover, the ALJ did not err in his assessment of Weidner's past work as an accounts payable clerk when he declined to find that the job also incorporated the primary duties of a file

16

clerk. (D.I. 10-2 at 20)  Weidner's filing duties in her accounts payable position were minimal, as evidenced by Weidner's own testimony that she carried boxes of files once every two days, and she confirmed that the majority of her time on the job was spent sitting. (D.I. 10-2 at 42) Courts within the Third Circuit have noted that the role of a file clerk requires standing and walking about half of the time. *See Giddings*, 2018 WL 4252426, at \*4.  Accordingly, the ALJ was under no obligation to treat Weidner's accounts payable position as a composite job incorporating the "main duties" of a file clerk.

### 2.  Weidner's mental impairments

Weidner alleges that the ALJ erred by failing to explain why he did not incorporate her mild, non-severe mental impairments into the RFC analysis or the hypothetical posed to the VE. (D.I. 16 at 6-8; D.I. 20 at 4)  According to Weidner, the ALJ's error is not harmless because those mild limitations affect her ability to perform her past relevant work in semi-skilled and skilled positions. (D.I. 16 at 9-12)  Weidner also argues that the ALJ should have sought further development of the record instead of assessing the severity of Weidner's mental impairments based on his own lay speculation. (*Id.* at 13-16)  In response, the Commissioner argues that the ALJ was not required to incorporate Weidner's mild mental limitations into the RFC assessment or further develop the record regarding Weidner's mental impairments because the evidence of record was sufficient to support the ALJ's RFC determination. (D.I. 19 at 6-9)

The ALJ did not err in failing to incorporate limitations associated with Weidner's mild mental impairments in the RFC and the hypotheticals posed to the VE.  An individual's RFC is an assessment of the most that person can still do in a work setting, despite the limitations caused by her impairments. 20 C.F.R. § 404.1545(a).  The ALJ must consider limitations imposed by all of an individual's impairments, even those that are not "severe." *Id.*; SSR 96-8.  However,

the ALJ's consideration of the individual's non-severe impairments does not amount to a requirement that the ALJ must include limitations in the RFC associated with mild impairments. *See Smith v. Comm'r of Soc. Sec.*, 2016 WL 3912850, at *9 (D.N.J. July 19, 2016) (concluding that the ALJ did not err in declining to include mental limitations in the RFC because he clearly considered the plaintiff's depression and concluded that the symptoms did not significantly limit her basic work activities).

In this case, the ALJ considered Weidner's mental impairments at step two of the sequential evaluation and found that her "depression and generalized anxiety disorder did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and were therefore non-severe." (D.I. 10-2 at 14) Applying the four areas of mental functioning set forth in the regulations, the ALJ determined that Weidner had no limitation in her ability to understand, remember, or apply information based on evidence showing that Weidner could manage money and shop in stores. (*Id.*) The ALJ found "at most a mild limitation" in the functional areas of interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (*Id.* at 14-15)

In similar circumstances, the Third Circuit has clarified that the ALJ's broad findings of limitations at step two should not outweigh the substance of the ALJ's overall review. *See Holley v. Comm'r of Soc. Sec.*, 590 F. App'x 167, 168 (3d Cir. 2014) (rejecting the claimant's argument that the ALJ erred by failing to tell the vocational expert she had moderate difficulties in concentration, persistence, and pace). Here, the ALJ noted that Weidner reported no difficulty getting along with authority figures, she had no issues finishing what she starts, and she was capable of tending to her personal care and going out independently. (D.I. 10-2 at 14-15) The ALJ explained that Weidner's medical records consistently showed she exhibited a normal

mood, affect, judgment, and behavior, exhibiting no deficits in concentration, persistence, or pace. (*Id.*) The ALJ's analysis confirms that the ALJ had sound knowledge of the entire record before making his decision about Weidner's RFC. *Holley*, 590 F. App'x at 168; *see Shaffer v. Colvin*, 2014 WL 4925067, at *5 (W.D. Pa. Sept. 30, 2014) ("It is clear from the record that the ALJ adequately considered all of the relevant medical evidence, as well as plaintiff's reported activities, in assessing plaintiff's residual functional capacity, and that he incorporated into his finding all of the limitations that reasonably could be supported by the medical and other relevant evidence."); *McCafferty v. Astrue*, 2008 WL 1869282, at *4 (E.D. Pa. Apr. 25, 2008) (finding that the requirements of SSR 96-8p were satisfied by ALJ's narrative discussion of the claimant's functional limitations in the context of the objective medical evidence, doctors' notes and opinions, the claimant's activities of daily living, and the claimant's subjective complaints).

In support of the statements made in the written decision, the ALJ cited medical records from Weidner's rheumatologist and primary care physicians because Weidner did not seek treatment with a specialist for her mental impairments, and those records show that Weidner's anxiety was controlled with medication. (D.I. 10-2 at 14-15; D.I. 10-8 at 90, 92) Moreover, the transcript of the hearing before the ALJ shows that Weidner did not describe any symptoms stemming from her mental impairments, nor did her counsel pose questions to the VE regarding limitations resulting from her mental impairments. (D.I. 10-2 at 40-75); *see Trauterman v. Comm'r of Soc. Sec.*, 296 F. App'x 218, 219 (3d Cir. 2008) (upholding ALJ's determination of non-severe depression at step two where the claimant did not identify a mental or emotional problem requiring treatment by a mental health professional in her testimony before the ALJ). The ALJ appropriately exercised his discretion in declining to include limitations addressing Weidner's mental impairments in the hypothetical posed to the VE or the RFC assessment based

19

on the thin evidence of limitations caused by those alleged impairments. *Holley*, 590 F. App'x at 168-69; *Wardell v. Berryhill*, C.A. No. 18-918-RGA, 2019 WL 1579501, at *6-7 (D. Del. Apr. 12, 2019) (upholding the ALJ's determination that mild mental limitations not impacting the claimant's ability to function need not be included in the hypothetical posed to the VE or the RFC assessment); *Shaffer*, 2014 WL 4925067, at *5-6 (finding no error in the ALJ's failure to include limitations arising from the claimant's non-severe mental impairments in the RFC finding because there was "no authority from this circuit suggesting that someone with merely 'mild' difficulties . . . should be limited to unskilled work or simple, routine tasks.").

In addition, the ALJ did not err by failing to further develop the record regarding Weidner's mental impairments. An ALJ has a duty to fully and fairly develop the record to make a determination of disability. *See Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995). The ALJ has the discretion to arrange for consultative examinations if the necessary information is not readily available from the claimant's treating sources. *See Thompson v. Halter*, 45 F. App'x 146, 149 (3d Cir. 2002); *Schwartz v. Halter*, 134 F. Supp. 2d 640, 657-58 (E.D. Pa. 2001); *see also* 20 C.F.R. § 404.1513. However, the ultimate responsibility for producing evidence of a disability rests with the claimant. *See* 20 C.F.R. § 404.1512(a); *Money v. Barnhart*, 91 F. App'x 210, 215 (3d Cir. 2004). Accordingly, "the ALJ's duty to develop the record does not require a consultative examination unless the claimant establishes that such an examination is necessary to enable the ALJ to make the disability decision." *Thompson*, 45 F. App'x at 149. "The ALJ's duty is only 'to ensure that the claimant's complete medical history is developed on the record before finding that the claimant is not disabled.'" *Shields v. Saul*, C.A. No. 20-687-JLH, 2021 WL 2209869, at *4 (D. Del. June 1, 2021) (quoting *Money*, 91 F. App'x at 216).

Weidner suggests that the ALJ was required to obtain the opinion of an appropriate medical professional after discounting the opinion of state agency psychologist Dr. Santilli, which was the only medical source opinion in the record regarding Weidner's mental impairments. (D.I. 16 at 14-16)  But courts in the Third Circuit have determined that an "ALJ is not precluded from reaching RFC determinations without outside medical expert review of each fact incorporated into the decision." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 362 (3d Cir. 2011); *see also Carter v. Colvin*, 2015 WL 1866208, at \*10 (W.D. Pa. Apr. 23, 2015).  In this case, the ALJ determined that Dr. Santilli's opinion regarding the insufficiency of the evidence of record was not persuasive because Weidner's medical records established her diagnosis and treatment for depression and generalized anxiety disorder during the relevant time period. (D.I. 10-2 at 15)  Instead of relying on his own lay opinion as Weidner suggests, the ALJ relied on Weidner's testimony and function reports establishing her ability to get along with authority figures, finish what she starts, tend to her personal care, and go out independently.  (*Id.* at 14-15)  Moreover, the ALJ cited Weidner's medical records showing consistent findings of normal mood, affect, judgment, and behavior, with no deficits in concentration, persistence, or pace.[5]  (*Id.*)  Because the record contains substantial evidence upon which the ALJ relied in making his decision, the ALJ's failure to obtain a consultative psychological examination or

---

[5] This same evidence supports the ALJ's decision to find Weidner's mental impairments to be non-severe at step two of the sequential analysis. *See Maddaloni v. Comm'r of Soc. Sec.*, 340 F. App'x 800, 802 (3d Cir. 2009) ("The record before us contains substantial evidence to support the ALJ's findings that Maddaloni's functional limitations were either 'mild' or 'none'" in the four areas of mental functioning, supporting the ALJ's determination of a non-severe mental impairment); *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 (3d Cir. 2007) (finding that diagnosis of depression, by itself, was not enough to establish severity at step two, and the claimant was required to present evidence showing that the impairment significantly limited her capacity to cope with the mental demands of working).

other medical opinion regarding Weidner's mental condition was not an abuse of discretion. *See Pekmezovic v. Colvin*, 2016 WL 7104385, at *2 (W.D. Pa. Dec. 6, 2016).

### 3. Medical opinion evidence

Weidner next alleges that the ALJ erred in evaluating the medical opinion evidence of her treating physicians, Drs. Walker and Scwhartz, by not sufficiently addressing the consistency between their medical opinions and instead crafting an RFC finding without any supporting medical opinion evidence. (D.I. 16 at 17-22)  The Commissioner responds that the ALJ properly considered the fact that the medical opinions of Drs. Walker and Schwartz were issued nearly three years after the date last insured, and neither doctor maintained a treatment relationship with Weidner for the duration of the relevant time period. (D.I. 19 at 14-15)  In addition, the Commissioner contends that the ALJ properly evaluated the consistency and supportability of the opinions by evaluating them against the objective medical evidence, the physicians' own treatment notes, and Weidner's daily activities. (*Id.* at 15-16)

In accordance with the revised regulatory framework for claims filed on or after March 27, 2017, which eliminated the treating physician rule, an ALJ is not required to give any "specific evidentiary weight, including controlling weight, to any medical opinion(s) . . ., including those from [a] medical source." 20 C.F.R. § 404.1520c(a).  Instead, the ALJ must consider the persuasiveness of all medical opinions based on the application of five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors. *Id.* at § 404.1520c(a)-(c).  The ALJ must explain how he considered the most important factors of supportability and consistency. *Id.* at § 404.1520c(b)(2).  "Consistency concerns the degree to which the opinion reflects the same limitations described in evidence from other sources, whereas supportability concerns the relevancy of objective medical evidence

and degree of explanation given by the medical source to support the limitations assessed in the opinion." *Eader v. Saul*, 2020 WL 10898140, at *3 (M.D. Pa. Nov. 20, 2020) (quoting *Serowski v. Comm'r of Soc. Sec.*, 2020 WL 6383187, at *12-13 (N.D. Ohio Oct. 30, 2020)).  There is no requirement for the ALJ to discuss or explain consideration of the remaining factors unless there are two or more medical opinions which are equally well supported and consistent with the record, but not exactly the same, in which case the ALJ must explain how he differentiated the opinions.  20 C.F.R. § 404.1520c(b)(2)-(3).

In this case, the ALJ determined that the opinions of Weidner's treating sources, Dr. Schwartz and Dr. Walker, were not persuasive because the limitations therein were not supported by the treating sources' own examination findings or Weidner's self-reported activities of daily living,[6] the opinions were rendered nearly three years after Weidner's date last insured, and each of the treating sources only saw Weidner for a fraction of the relevant time period.  (D.I. 10-2 at 19)  For example, the ALJ explained that limitations of sitting, standing, and walking for less than two hours total of an eight-hour workday were inconsistent with Dr. Walker's treatment notes reporting that Weidner walked her dog daily, drove, and had normal balance and gait.  (*Id.*)  The ALJ also suggested that opinions regarding Weidner's inability to look down or turn her head were not supported by Dr. Schwartz's treatment records from September 2015 stating that Weidner's neck pain did not limit her ability to do anything.  (*Id.*)  In this regard, the ALJ

---

[6] Weidner challenges the ALJ's "extensive" reliance on her care for her in-laws in his decision, pointing out that her in-laws had an aide.  (D.I. 16 at 21)  But the ALJ's discussion of Weidner's caregiving duties in his discussion of the medical opinion evidence is limited to a single sentence noting that treatment records from September 2015 and March 2016 describe Weidner as "being mostly the primary caregiver for her in-laws who required a lot of help."  (D.I. 10-2 at 19)  A review of the record demonstrates that this is a salient point.  Although Weidner now claims that she stopped working due pain caused by her impairments, three sets of medical records from in and around the relevant time period indicated that she stopped working to care for her in-laws.  (D.I. 10-2 at 59-61; D.I. 10-7 at 15, 435-36; D.I. 10-8 at 91)

directly addressed the limitations expressed in the opinions and articulated why he found them to be inconsistent with Weidner's treatment notes. *See Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (holding that an ALJ may not "reject evidence for no reason or for the wrong reason."). The ALJ's assessment meets the standard in the new regulations, and his determination is supported by substantial evidence.

Weidner argues that the ALJ's analysis under the new regulations is erroneous because the opinions of Drs. Schwartz and Walker were consistent. But the regulations suggest that Weidner's definition of "consistency" is too narrow. Pursuant to 20 C.F.R. § 404.1520c(c)(2), "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. § 404.1520c(c)(2). Thus, the inquiry regarding consistency is directed to the record as a whole, and not just to the narrow universe of medical opinions. *See Laicha v. Kijakazi*, 2021 WL 3929739, at *12 (M.D. Pa. Sept. 2, 2021) (upholding ALJ's rejection of treating source opinion as unpersuasive because "the opinion was inconsistent with his treatment notes . . . as well as [the claimant's] self-reported activities of daily living."). To the extent that the ALJ's opinion does not expressly use the word "consistent" or "consistency," this is not sufficient to require remand because the ALJ plainly considered the consistency of the medical opinions with the evidence of record. *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) ("The ALJ . . . need not employ particular 'magic' words.").

### 4. Weidner's cervical degenerative disc disease

Finally, Weidner contends that the ALJ erred by failing to include any functional restrictions in his RFC to account for Weidner's severe cervical degenerative disc disease. (D.I.

16 at 22-23)  Weidner argues that the limitations resulting from her severe cervical degenerative disc disease would have precluded her from performing her past jobs.  (*Id.* at 23)

Page 16 of the Commissioner's brief points out the ALJ's findings regarding Weidner's cervical spine condition based upon the medical records of Dr. Schwartz in the three months prior to the date she was last insured.[7]  (D.I. 19 at 16)  As previously discussed at § IV.B.3, *supra*, Dr. Schwartz's treatment notes reveal no limitations that should have been included in the RFC's finding.

Courts within the Third Circuit have rejected the position that an ALJ is required to include limitations in an RFC specific to each severe impairment, stating that "there is no requirement for such a one-to-one correlation between a severe impairment and a limitation included in the RFC." *Smith v. Comm'r of Soc. Sec.*, 2017 WL 5046371, at *1 n.1 (W.D. Pa. Sept. 13, 2017).  Here, the ALJ accounted for Weidner's severe impairments as a whole by limiting her to sedentary work with additional postural restrictions.  (D.I. 10-2 at 16)  The ALJ expressly discussed Weidner's cervical degenerative disc disease and acknowledged Weidner's complaints that she had problems moving her neck.  (*Id.*)  However, the ALJ found that Weidner's neck problems did not require any limitations beyond those already included in the RFC in light of treatment records reporting that the pain she experienced when turning her head to the left "was not limiting her ability to do anything," and x-rays and examinations revealed a decreased range of motion but no tenderness or spasm in her cervical spine.  (*Id.* at 18)

---

[7] Weidner incorrectly contends that the Commissioner waived any defense by failing to respond on this issue.  (D.I. 20 at 10)  Regardless, a defendant's failure to respond "is not alone a sufficient basis for the entry of summary judgment." *Anchorage Assocs. v. Virgin Islands Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990).  Even where a party does not oppose a movant's argument, the court must still find that the circumstances warrant judgment as a matter of law. *See Miller v. Ashcroft*, 76 F. App'x 457, 462 (3d Cir. 2003).

Accordingly, substantial evidence supports the ALJ's determination that the limitations included in the RFC were sufficient to address Weidner's severe cervical degenerative disc disease.

## V.   CONCLUSION

For the foregoing reasons, I recommend that the court DENY Weidner's motion for summary judgment (D.I. 15) and GRANT the Commissioner's cross-motion for summary judgment (D.I. 18).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The objection and responses to the objections are limited to ten (10) pages each.  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court.  *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006*)*; *Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated:  February 1, 2022

Sherry R. Fallon
United States Magistrate Judge